# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 24-686 consolidated with 24-687

**MCKINLEY WAYNE GUIDRY AND SETH GUIDRY**

**VERSUS**

**ENTERGY SERVICES, LLC**

**ENTERGY LOUISIANA, LLC  AND**

**XYLEM, INC. OF VIRGINIA**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-20718 AND NO. 10-20719
HONORABLE PENELOPE QUINN RICHARD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

### GUY E. BRADBERRY
### JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, Ledricka J. Thierry, and Guy E. Bradberry, Judges.

**REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.**

**Jennifer A. Jones**
**Jones Law Firm**
**1231 Marshall Street**
**Cameron, LA 70631**
**(337) 249-1056**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **McKinley Wayne Guidry**
    **Seth Guidry**

**Robert A. Mahtook, Jr.**
**Kaliste Joseph Saloom, IV**
**Mahtook & LaFleur, LLC**
**600 Jefferson Street, Suite 1000**
**Lafayette, LA 70501**
**(337) 266-2189**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Entergy Louisiana, LLC**
    **Xylem, Inc. of Virginia**

**BRADBERRY, Judge.**

Defendants, Entergy Louisiana, LLC and Xylem, Inc. of Virginia, appeal a trial court judgment awarding damages to McKinley "Butch" Guidry and his son, Seth Guidry, for the loss of live oak and pecan trees on their properties that were cut down after Hurricane Laura in 2020. The trial court found that Defendants were liable for negligently clear-cutting the oak and pecan trees on Plaintiffs' properties and awarded damages.

## FACTS

Immediately following Hurricane Laura in 2020, Entergy began assessing the damage in Cameron Parish. As part of the restoration efforts, Entergy contracted with companies to clear trees, limbs, and bushes so that it could access utility lines and poles to make the necessary repairs. Xylem was one of the companies Entergy employed because it already had an existing base load contract with Xylem for routine maintenance work in Arkansas, and Xylem knew Entergy's policies for trimming trees. Entergy entered into a storm contract with Xylem to perform the post-hurricane work in Louisiana.

As part of the work following a hurricane, Entergy elevates senior journeymen to the role of circuit bosses. In the present case, Mack LaVergne became the circuit boss of the area fed by the Solac 190 substation, which included the Cameron Parish area where the Guidrys' property was located. As a circuit boss, he was responsible for directing all the line contractors and vegetation contractors on that particular circuit. Following a hurricane, the circuit boss initially sends out scouts to assess the damage and identify what lines and poles are down. Then he sends out the vegetation contractors like Xylem to clear the way for the repairs to be made.

Travis West, a certified line clearance tree trimmer arborist employed by Xylem, was deployed to Lafayette at a staging area prior to the landfall of Hurricane Laura. After the storm, Travis was assigned to the Cameron Parish area. He was an on-site supervisor managing multiple tree-trimming crews. He would meet daily with Mack LaVergne about the work that needed to be accomplished. Mack would lay out the route of the Entergy line crews, and Xylem would work ahead of them to clear the way. Travis explained that Xylem was trimming for access to repair the equipment. Travis testified that at some point the scope of the work changed to clearing so that all the poles could be changed.

Butch Guidry and his wife lived on Hebert Camp Road in Cameron Parish. He donated part of the land to his son, Seth, who lived there with his wife and children. They evacuated for Hurricane Laura but returned the day after to check on their homes. Butch explained that the trees were still standing along the roadway. The leaves were missing, and some limbs were broken. Eventually, Butch and his wife moved back on the property on September 8, 2020, with generator power. Seth was with them. At that time, he noticed that the trees had been cut down on his property. The workers were still there with chainsaws in their hands, continuing to cut down trees. Butch and Seth approached them and asked them to stop cutting the trees down. Travis West testified that Xylem stopped cutting the trees down and never returned to the property.

Butch and Seth each filed separate suits against Entergy and Xylem on September 1, 2021, for intentional trespass, loss of timber, loss of aesthetic value, mental anguish, cost of cleaning and clearing the damaged land, attorney fees and court costs, and treble timber damages pursuant to La.R.S. 56:1478.1, now La.R.S.

2

3:4278.1. Prior to trial, Seth and Butch filed a motion to consolidate the actions. A judgment was signed on August 21, 2023, granting the motion to consolidate.

A two-day bench trial was held on November 20–21, 2023. At the close of Plaintiffs' case, Defendants moved for an involuntary dismissal of Plaintiffs' claims for treble damages under La.R.S. 3:4278.1(E), which the court found inapplicable finding no evidence that Defendants acted in bad faith. At the conclusion of the trial, the case was taken under advisement. The trial court issued written reasons for judgment on February 5, 2024. The trial court found Defendants were "liable for failing to follow ENTERGY's Line Clearance Specifications and for negligently clear-cutting the Guidrys' property instead of trimming plaintiffs' trees for line access." The trial court awarded damages.

On April 16, 2024, Plaintiffs filed a motion seeking clarification of the apportionment of fault to each Defendant and clarification of the apportionment of certain damages awarded to Plaintiffs. A hearing on the matter was held on July 1, 2024. A judgment was signed on August 2, 2024. Damages in the amount of $78,850.00 were awarded to Butch, and Seth was awarded $79,850.00 in damages. Fault was apportioned 50% to Entergy and 50% to Xylem on each award.

## SERVITUDE

Defendants argue that they have a servitude established by a 1948 agreement with the landowner at that time. They argue that the servitude allows them the right to trim and cut trees on the Guidry property to allow access for the removal and replacement of the utility lines and equipment that were damaged or destroyed by Hurricane Laura. In the alternative, Defendants argue that a servitude was created through the *St. Julien* Doctrine or by acquisitive prescription.

The trial court's reasons for judgment and judgment are silent as to the existence of a predial servitude. "Silence in a judgment as to any part of a demand or any issue litigated is construed as a rejection of that claim or issue by the trial court." *Reed v. La. Horticulture Comm'n.*, 21-657, p. 5 (La.App. 1 Cir. 12/22/21), 341 So.3d 66, 71, *writ denied*, 22-284 (La. 4/12/22), 336 So.3d 89.

Appellate courts review findings of fact pertaining to servitudes under the manifest error standard of review. *Carpenter v. Guillory Inv., Inc.*, 18-571 (La.App. 3 Cir. 2/27/19), 266 So.3d 581, *writ denied*, 19-748 (La. 9/17/19), 279 So.3d 384. "An appellate court may not set aside a trial court's findings of fact unless they are manifestly erroneous or clearly wrong." *Allen v. Cotton*, 11-1354, p. 3 (La.App. 3 Cir. 5/2/12), 93 So.3d 681, 683. "To reverse under the manifest error rule, an appellate court must find from the record that there is no reasonable basis for the trial court's finding and that the record shows the finding to be manifestly erroneous." *Id.*

**<u>1948 Agreement</u>**

Defendants claim that Entergy's servitude was establish through a 1948 agreement that gives them the right to cut and trim all trees within fourteen feet of poles, lines, and equipment. Plaintiffs argue that the 1948 servitude has no application in this case.

"Predial servitudes are established by all acts by which immovables may be transferred." La.Civ.Code art. 722. Predial "servitudes are regulated by the title by which they are created[.]" La.Civ.Code art. 697. "A predial servitude may be established on a certain part of an estate, if that part is sufficiently described." La.Civ.Code art. 727. "Doubt as to the existence, extent, or manner of exercise of a

4

predial servitude shall be resolved in favor of the servient estate." La.Civ.Code art. 730.

"Interpretation of a contract is the determination of the common intent of the parties." La.Civ.Code art. 2045. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La.Civ.Code art. 2053.

In 1948, Agnes Hebert, Plaintiffs' ancestor-in-title, granted a utility servitude to Gulf States Utilities. Gulf States later merged with Entergy. The agreement provided the utility company:

> [W]ith the right to go on the land of Owner . . . to remove, trim and keep trimmed any trees or bushes, without further payment, so that there shall be a clearance of 14 feet between any part of any tree or bush and the above mentioned poles, wire or other equipment.

Defendants note that both their surveyor and Plaintiffs' surveyor indicated that every tree that was trimmed or cut down was within fourteen feet of its utility poles, lines, and equipment.

Plaintiffs refer to the location of the servitude in the right-of-way agreement as: "Approx. 10 ft. S more or less from pop. line running along public road on S. side and to run in southwesterly direction." Plaintiffs note that both surveys indicated that the poles and overhead power lines are located between forty and forty-five feet south of the north property line, which is significantly more than ten feet. It is Plaintiffs' position that since the utility equipment is located outside the specified boundaries of the 1948 contract, its provisions are inapplicable.

Defendants point to the fact that the description also contains the terms "approx.[imately]", "more or less", and "southwesterly". Defendants argue that

5

installation of the poles in the exact location designated in the agreement would have placed them in the center of Hebert Camp Road which is nonsensical. Defendants argue that the final placement of the poles was the best place, and this placement least restricted Plaintiffs' property.

Jamie Chapman, Entergy's senior regional manager over the distribution line for the western region of Louisiana, testified about Entergy's AMFM report introduced into evidence by Defendants. The AMFM report gives linemen or designers an idea of what poles, wires and equipment are in a specific area. Jamie explained that the poles are marked with the year they are placed. Based on the information contained in the AMFM report for this area, the power line on the Guidrys' property had been in place since at least 1954.

When Butch and his wife leased the property in the mid-1980s and later purchased the property in 1988, the utility poles and lines were in the same location. In 2004, they donated a portion of the property to Seth. There is no evidence in the record that any landowner ever objected to the location of the poles and lines.

Defendants cite *J.C. Trahan Drilling Contractor, Inc. v. Younger*, 169 So.2d 15 (La.App. 2 Cir. 1964), and *Burgas v. Stoutz*, 174 La. 586, 141 So. 67 (1932), for the proposition that any insufficiency in the description in a servitude agreement as to the traversal of the right of way does not render the conveyance void for want of certainty if the grantee actually constructs the line on the land in accordance with the intent of the parties.

In *Istre v. S. Cent. Bell Tel. Co.*, 329 So.2d 486 (La.App. 3 Cir.), *writ denied*, 333 So.2d 233 (La.1976), this court held that landowners who acquiesced in the construction of an underground telephone cable were barred from recovering trespass damages. This court cited *Gray v. State, Dep't of Highways*, 250 La. 1045,

6

202 So.2d 24 (1967), which held that when an owner of land is aware his property is being appropriated for public use and takes no action to prevent it, he cannot later complain. These cases suggest that mere silence or lack of complaint by the landowner may be interpreted as acquiescence. Furthermore, "Modification of a written agreement can be presumed by silence, inaction, or implication." *Gucci 1 Field Servs., LLC v. Reeves*, 23-73, 23-74, 23-75, 23-76, p. 7 (La.App. 5 Cir. 11/8/23), 377 So.3d 354, 360.

While the description is not exact, we do not find it vague. Further, we find that there is nothing in the record establishing that an objection to placement of the lines and poles by the landowner occurred. Therefore, it can be presumed that the landowner consented to the placement of the lines and poles in the location they were placed. We find that the trial court clearly erred in failing to find the 1948 Servitude Agreement in effect. This finding obviates the need to address Defendants' alternative arguments that they have a servitude under the *St. Julien* Doctrine or by acquisitive prescription of thirty years.

### REASONABLE AND NECESSARY

In its reasons for judgment, the trial court found that Defendants failed to follow their own line specifications by negligently clear-cutting the Guidrys' trees instead of trimming them for line access. Defendants argue that they had a right, as the dominant estate, to maintain and preserve their servitude pursuant to La.Civ.Code art. 744, which allows the owner of a dominant estate to make all works that are necessary for the use and preservation of the servitude. Defendants also note that the agreement allows them:

> [T]he right to go on the land of Owner . . . to remove, trim and keep trimmed any trees or bushes, without further payment, so that there

7

shall be a clearance of 14 feet between any part of any tree or bush and the above mentioned poles, wires or other equipment.

However, as noted by Plaintiffs, these rights "are to be exercised in a way least inconvenient for the servient estate." La.Civ.Code art. 743. The court in *Weigand v. Asplundh Tree Experts*, 577 So.2d 125, 129 (La.App. 1 Cir.), *writ denied*, 580 So.2d 379 (La.1991), recognized that a utility company has the right to cut or trim trees when it is necessary to preserve its servitude but also noted: "that when it becomes necessary, in maintaining electrical lines, to remove, cut or trim trees and shrubs, it must be done in a reasonable manner, with due regard to the rights of all parties." While the trees that were cut were in the fourteen-foot servitude, the question is whether it was reasonable and necessary and exercised in a way least inconvenient for Plaintiffs' property.

Defendants claim that they established that the trees needed to be removed to safely remove damaged lines and equipment through the testimony of Mack LaVergne. Mack testified that he told Travis West that Entergy needed to access every pole, not that they were going to be replaced. Mack explained that they needed to clear to a point to be able to get the service line up safely because this was one of the biggest storms he had ever seen as far as a widespread damage event. On Hebert Camp Road, they had to restring all new lines, which would require access from pole to pole, meaning complete clearance between poles.

Travis testified that Xylem was not brought in to do trimming and maintenance but for storm response. The crews would meet daily with Mack on the scope of work. He testified that the initial scope of the work changed based on his conversations with Mack. The work went from trimming in order that lines could be accessed for repair to clearing so that all poles and lines could be replaced.

Entergy did not come out and tell him what trees to cut down. Travis made the decision on what trees to cut down based off the information he had from Mack. Travis explained that it may become necessary to deviate from standard pruning practices when there is a widespread restoration project and clearance is needed to rebuild and speed up the restoration process. Xylem deviated because it was his understanding that the whole infrastructure was going to be rebuilt.

Travis testified that he would not have cut the trees in that manner if Entergy was not replacing all poles. He explained that spot treating the areas requires less clearing than a total rebuild. Maintaining trees and vegetation is an important part of the job.

Travis testified that most of the trees cut down were directly under the power lines. They did not finish cutting the trees because the Guidrys told them to stop, and they never returned to the property. The three poles on the Guidrys' properties did not have to be replaced.

Defendants also argue that they followed Entergy's line clearance specifications, which allow for deviations during an emergency response to natural disasters. Defendants contend that the elevated danger caused by Hurricane Laura necessitated a deviation from the standard tree trimming practices.

Jamie Chapman explained that the Louisiana Public Service Commission (LPSC), the governing body over utilities, requires Entergy to maintain written line clearance specifications and file them annually. She testified that the standards require, "'Tree trimming and pruning shall be performed in accordance with modern arboricultural standards.'" The LPSC also required Entergy to file written policies for tree removal.

9

Jamie explained that Entergy has specifications for its yearly trim cycle for line clearance. The purpose of the maintenance program is to minimize the amount of damage a tree can cause to a power line. These specifications are incorporated into Entergy's contracts with tree trimming contractors. Jamie admitted that nothing in the specifications allowed a contractor to clear-cut around equipment in the event of a storm or ignore the specifications in the event of a natural disaster.

Entergy's written line specifications were introduced into evidence. The specifications provide that "[t]rees shall be trimmed as to provide a maximum clearance from primary conductors." In rural areas, live oak trees should have a line clearance of ten feet and pecan trees should have a clearance of fifteen feet. Tree removal specifications require that trees with a greater than eight-inch diameter should be considered removed if they are "[d]ead, dying, diseased, decayed, or leaning . . . which endanger the safe operation and maintenance of energized primary conductors[.]"

Defendants argue that Entergy's Line Clearance Specifications also provide that all work "shall be performed in accordance with modern arboricultural standards." Citing testimony from Plaintiffs' expert in urban forestry and arboriculture, Dr. Frederick Fellner, Entergy points out that the American National Standards Institute A300 publication provides the modern arboriculture standards for pruning trees. This standard provides that there is a deviation from standards following storms as follows:

> Following severe storms, tree damage is often widespread, and utility services may be interrupted across a large area. At such times, government authorities or utilities may declare an emergency. Emergency service workers, including utility arborists, are likely to be involved in a coordinated effort to restore critical services. Damaged trees have the potential to imperil the safety of both the public and utility workers. To expedite restoration efforts under such urgent

10

circumstances, it may be necessary for workers to deviate from standard pruning practices until the emergency is over and services are rendered.

While Defendants were not working under normal circumstances and were responding to events following a catastrophic storm that rendered destruction on a widespread basis to Entergy's electrical system, evidence indicated that there were no clear-cut directions on the process to be followed. Based on the evidence, the trial court was correct in finding that there was a miscommunication between Mack of Entergy and Travis of Xylem. Travis thought he was supposed to cut down trees to make way for the placing of new poles and new electrical wire. Mack stated that he told Travis that only the electric wire was going to be replaced. The line specifications of Entergy do not call for the cutting down of trees after a storm, so it would follow that line specifications as to trimming should still be followed. Travis agreed that Xylem would not have cut down the trees if the poles were not going to be replaced, and testimony established that none of the poles were replaced. Therefore, we find no manifest error in the trial court's finding that Entergy's line specifications were not followed and the cutting down of the trees was not necessary.

### VALUE OF SOUTHERN LIVE OAKS

Defendants claim that the estimates to replace the southern live oaks provided by Dr. Fellner were stale and inaccurate. Dr. Fellner's estimates were prepared one-and-a-half years before trial and estimated $10,000 per live oak tree to replace them. They argue that the estimate given by their expert arborist, Dr. Brock Barker, should be used because he contacted the same tree farm as Dr. Fellner forty-five days before trial to ascertain the value and availability of replacement trees. The figure he received was $2,500 less per live oak than the figure obtained by Dr. Fellner.

11

The party responsible for causing property damage to another is liable for the cost of restoring property to its former condition as it was immediately preceding the damage. *Hornsby v. Bayou Jack Logging*, 04-1297 (La. 5/6/05), 902 So.2d 361; *Ivory v. Safeway Ins. Co. of La.*, 19-521 (La.App. 3 Cir. 12/18/19), 287 So.3d 807.

> Generally, the method of estimating the value of a shade or ornamental tree wrongfully removed is to compare the value of the surrounding property before and after the removal; however, the trial court has discretion to apply a different measure of damages in cases involving willful and wanton disregard for the interests of the property owner.

*Pearce v. L.J. Earnest, Inc.*, 411 So.2d 1276, 1279–80 (La.App. 3 Cir.), *writ denied*, 414 So.2d 377 (La.1982).

"Special damages are those which have a 'ready market value,' such that the amount of damages theoretically may be determined with relative certainty[.]" *Kaiser v. Hardin*, 06-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810. "In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong." *Id.*

A total of seventeen trees were cut on Butch's property, and a total of seven trees were cut on Seth's property. Butch lost three live oak trees. Seth lost two live oak trees. The oak trees ranged in diameter from twenty-two inches to thirty-one inches. The replacement trees were only eight to ten inches in diameter. Brock agreed that all the replacement trees would be significantly smaller than the destroyed trees. Brock also agreed that availability and pricing of the trees fluctuates.

We find the trial court's award of $10,000 for each live oak reasonable. Plaintiffs are not even getting a similar tree since they are significantly smaller than the trees that were cut down.

## DAMAGES FOR DEBRIS AND STUMP REMOVAL

Defendants finally argue that the trial court erred in awarding damages for debris and stump removal. They argue that testimony at trial established that Plaintiffs would never be responsible for debris and stump removal, which the Plaintiffs knew. Defendants claim that Butch, as a Cameron Parish police juror, knew that FEMA paid for debris and stump removal. Plaintiffs argue that they did not apply for FEMA stump removal because the stump had to be at a forty-five-degree angle, and FEMA only removed stumps that were blown over by the hurricane and not cut down by utility companies. Plaintiffs argue that Defendants' argument is in direct conflict with the collateral source rule.

"Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *La. Dep't of Transp. and Dev. v. Kansas City S. Ry. Co.*, 02-2349, p. 6 (La. 5/20/03), 846 So.2d 734, 739. "Under this well-established doctrine, the payments received from the independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer." *Id.* "A wrongdoer's liability should not be reduced by the amount of collateral source payments to an injured plaintiff, even where the nature of the collateral source is a public relief provided to the plaintiff by application of federal or state law." *Id.* at 743.

We find that the trial court did not err in awarding damages for debris and stump removal. First, there was no evidence that FEMA removed the debris and

13

stumps associated with the cut-down trees.  Second, even if there was, Entergy and Xylem cannot benefit from its wrongdoing by any efforts made by FEMA.

For the reasons set forth in this opinion, we find that the 1948 servitude was applicable and reverse the trial court's finding as to that issue.  We affirm the judgment in all other respects.  Costs of this appeal are assessed to Entergy Louisiana, LLC and Xylem, Inc. of Virginia.

**REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.**